Your Honors, may it please the Court, my name is Charles Kerr. I'm here on behalf of the appellant, Joppatowne G.P. Limited Partnership. With me is my wife and partner, Kathy McDonald. In this appeal, Your Honor, Your Honors, Joppatowne asked the Court basically to do two things. First and foremost, to reverse the district court decision that two of the nine flea market vendors in this flea market rented premises violated the restrictive use covenant between my client, Joppatowne, the landlord and residents. Second, whatever the outcome of that decision, Joppatowne also asked the Court to vacate the injunction, the permanent final injunction that was issued in this case by the district court. In terms of the issues in the case, there are, the Court is well aware, a myriad of issues, but there are three that I wanted to focus on in the argument today. With regard to the first issue, it's basically a provision in the restrictive use covenant, for lack of a better expression, is a stand-down provision. At 13d.1 of the restrictive use covenant, the covenant says that if Redner's is in breach of its duties to the landlord, during the time that it's in breach, the restrictive use covenant does not apply. That is a fairly straightforward argument that I'll come to in a moment. If the Court agrees with the position of Joppatowne, then that really is the end of the case. If that is the decision that the Court makes, all the other issues... Your question has a premise, which is that Redner was in breach. Yes, I'm sorry. And what I was going to say is the district court found as a factual matter that Redner's was not in breach. And for the reason that the parties had agreed that there wasn't going to be any additional rent or payments required on the sale of the gasoline at that station. So you've got a district court finding here, which says there's no breach on this point in the part of Redner's, which undercuts your premise. May I address that, Your Honor? Yes. I think that conclusion is a conclusion of law. It's not a conclusion of fact. But the Court concluded is that the 13B1 did not come into play because it concluded when it construed the contract, which has three distinct parts to it. It concluded that the letter agreement, which is the second to the third part, excluded, wiped out the percentage rent provision that was clearly in the contract. And that... What position does Mr. Fowler occupy in your organization? Mr. Fowler is in-house counsel at the Cordish Company. The Cordish Company is basically the supervisory entity for a series... I'm sorry, for a series of... So this is in paper. He wrote a... He writes a letter to Mr. Smith, who's the broker in the whole deal, and says the landlord is, quote, this is quoting from that letter, was not asking for anything in return for allowing the gas pump. And that's correct. May I walk with you on that one? That's not a very favorable piece of evidence. I think it is if I can walk with you on the context. The percentage rent provision is Section 4.02 of the Rent Article, Article 4. Percentage rent is defined as being a percentage, which varies from year to year, of the amount of receipts over a floor level. And what goes into receipts is basically everything other than 15 distinct exceptions, none of which are gasoline or items sold at the gas station. 402... But you say you're not asking for anything. From my perspective, we're asking for the lease, as it was entered into and entered into at the end, to be enforced exactly as it was. Exactly as it was means the percentage rent requirement, which is in 4.02b, was in at the beginning, it was in at the middle when the letter is done, and it's in at the end when the Amendment No. 1 is signed, which basically says it incorporates and is the integrated contract for all of the aspects of this agreement. And if I can, again, if I can walk with you on that, the actual letter... What does it say when you have the letter agreement says that renters will pay, quote, no additional rent costs? This is not additional. It's the same percentage rent that's been there from the get-go. And there is no... If you wanted to change that, if you wanted to make a difference in the rent obligation, you would have had to add a new exception 16 to 4.02b. When you apply traditional Maryland parole evidence law to this contract, I think that's the only conclusion that you can come to. The language doesn't change. The actual language in the letter, the 310-606 letter, is that they'll construct the gas pumps at no additional rental cost. This is not an additional rental cost. This is a given rental cost that was there from the get-go. Why wouldn't any rent be an additional rental cost? Every time the percentage rent amount changes each year, you're going to get different dollar amounts. What goes into the ingredients to the rental... But didn't the earlier letter say it was not asking for anything in return for allowing the gas pump? To me, what that means is they were asking, and they got the lease not to change on everything from percentage rent to the annual rent that was paid. And frankly, Your Honor, there were, in fact, changes that were ultimately made to the additional rent provision that deals specifically for the gas pumps. That's included in Amendment Number 1. But in terms... I'm sorry. What about the language in the September 12 letter saying, landlord is permitting tenant to use this area at no cost? To me, Number 1, that's parole evidence. But Number 2, it's no different from what's actually in the March 10 letter. No additional rent means rent's not going to go up, it's not going to change. What we said, that's fine. 4.02% of percentage rent doesn't change a width. There's no new exception for any other source of income being thrown off by these gas pumps. But are you putting gloss on the language of the letters? Because if you were really conveying to Redners what you're now conveying to us, all of these various communications would have said, we ask for no rent above and beyond what is already agreed to in the contract, or that the rent will be the standard percentage rent as agreed to in the lease. But that is not the language that's used. It says you get to use the area at no cost, no additional rent cost. We're not asking for anything in return. Now, that's kind of an awkward way of expressing what you just expressed. Because what you just expressed is not a quotation from the letters. That's your language. I'm sorry. I didn't mean to interrupt. That's your language. And the argument you're making should have found this expression that you could point to somewhere where they said the percentage rent will be the rent stipulated in the earlier lease agreement and the earlier contract. But the letters don't say that. I respectfully disagree. I think that's clearly what they say. I think what they're saying is that the original 4.02 language, which is what's being endorsed in the large 10 letter, and which has been explicitly endorsed in the end of the sequence amendment number one, there is no change in that. But you're not quoting from the letter. I'm quoting from the contract as a whole. 4.02 does not change. If you're a transactional lawyer, as these folks were very sophisticated transactional lawyers, and you want to affect a change of percentage rent so that it includes a new category 16, that's what you do. That's exactly what they did on additional rent. In the March 10 letter, they said there wasn't any change in rent. But there actually is. When they get to the end of the road, when they do the amendment number one, they expressly change restrictive additional rent provision to include things going to the pumps. And it seems to me that is, in fact, the correct way to look at this as a whole. Didn't change at the beginning. Didn't change at the middle. Didn't change at the end when it comes to percentage rent. Did change on additional rent, because that was expressly addressed and agreed to. I understand your point there. I thought the trial courts did a pretty good job with the case. But one of the things that concerned me about your approach was that you agreed to a restrictive covenant. And the terms of the restrictive covenant, and this was the whole thing that led to Redner's deciding to locate as an anchor in the shopping center, was that they weren't going to face certain forms of competition. And that's a pretty standard restrictive covenant when a landlord at a shopping center wants to lure a big anchor store. And you said, well, we weren't going to have, we weren't going to allow any seafood stores or butcher stores, which would have undercut Redner's basis. And then, lo and behold, not too long after that, we have a store labeled, All Fresh Seafood and Laps Fresh Meats. Now, that's in the face of a restrictive covenant saying no seafood stores and no butcher shops. And we have two tenants who you let in whose very, the name of the store, indicates to me that they are a seafood shop and a butcher shop. How could they be others? I mean, why was the district court wrong? Are you contending that they were something other than what their name suggested? I've actually had a more fundamental level of disagreement with Your Honor. There is a phrase in A1, which starts with grocery store at one end and food market at the other, and it's sandwiched in between butcher shops and seafood shops. That's a general description of the types of things that are going to be talked about in what is a very complicated restrictive use covenant. The phrase that starts at one end and goes to the other, I believe is what's being addressed in the second section. Butcher shops and seafood shops within the scope of coverage of the restrictive covenant. From my perspective, only within the food exceptions that are set forth in A2, 1 through 4. If you start with the big box market, that's one thing that has certain limitations to it. The one that the court fastened on, the 15,000 square feet or less, basically is allowed to sell all kinds of things that grocery stores sell. Fresh and frozen meat, for example. Celery, sorry. Cereal, pet food. Those are all standard grocery items. But seafood shops and butcher shops are not defined anywhere in the lease. There's no definition of them. And if they're not defined in the lease, why wouldn't we just take them in their common ordinary meaning? I would try to persuade you that they are simply labels within a given phrase of types of stores that sell food. And what was really done in the next section is to define what limitations there are on that kind of cross-selling competition. When you get down to the 15,000 square feet or less vendors, that would include butcher shops, that would include seafood shops, that would include grocery stores. You can understand why the district court was concerned that you, as the landlord in this shopping center, had signed a lease agreement with a restrictive covenant, which was the whole reason Redner's agreed to locate there. And no sooner did they locate there, than they find that two stores, which seem to be within the scope of the restrictive covenant, are there competing with it. And they think, well, you just went back on your promise. That's at least the way the district court saw it, and I'm not sure they're 100% right, but you need to get me off my concern about the fact that you lured these people with one set of promises, which you promptly violated. And that is the problem I'm having, and you need to get me off of that. I'll try, John. I'll try. This is a sophisticated, long-negotiated competition. You can't tell me that, all right, what you're saying to me is that I'm unsophisticated. No, no, no. And that's fine. You've said it 15 times. This is sophisticated, this is complex. Okay, I get it. But when I read the language, it just has kind of a plain meaning to me. I mean, I'm not a real estate lawyer, but I do know how to read. I had no doubt about that, Your Honor. But what I'm trying to suggest to you is that this is, in fact, a three-layer restrictive use covenant. We haven't talked about things like ethnic food stores and specialty food stores and the like. Basically, what happened between the transactional lawyers is they've got two competing objectives. The landlord wants to have as much opportunity as he can to bring in additional tenants. They're likely to help the entire supermarket. The gretners wants to limit the competition. But the arrive at is a complicated way of doing just that. At the first level, they limit the level of business activity within these food, butcher shop, and the like entities to a specific percent, 25% of a given set of areas. That limits, and that's something that's acceptable to the gretners, the level of competition you're going to get at that level of size. When you deal with things... You have some rebuttal time, I think, also, Mr. Kerr. I apologize. All right. I appreciate that. Thank you. Thank you. Mr. Maravich. Thank you, Your Honors. John Maravich for Renter's Markets, who's the plaintiff here and the appellant in the second appeal. There actually were four arguments that the Joppatown had raised. I'll just briefly cover them, since they didn't cover them in argument. But there's an extensive argument on the failure to join... Could you speak up a bit? I'm sorry. There's an extensive argument on the plaintiff's failure to join under Rule 19. With respect to that argument, if you look at the case law that is actually cited by Joppatown, there is no case that suggests that under circumstances of a restrictive covenant such as this, that there was any obligation on that behalf to take the tenants from another... Yeah, we understand your argument on that. They were never parties to the agreement. With respect to the percentage rent issue that, well, I think Mr. Kerr spent most of his time on, and the court spent most of its time on. In addition to that, if you take the approach that Joppatown asked you to take in their oral argument, which is to kind of go back into the original lease and decipher aspects of the original lease, you'll see that demised premises is the only portion, capital D, capital P, the only portion of the property that the percentage rent applies to. When they amended the lease, they didn't amend the lease to include demised premises, to include this island that's out beyond the parking lot, which is where the gas station was put. And there's a lot of background to the gas station. At the time, there was already a breach of the lease by Joppatown because they couldn't get the construction done. And Rentners were willing to pay for the construction of the original building, a portion of that over the budget, and willing to extend the contract. There was an issue with, I think, a sewer line, so that this could actually get done. And the court is correct. This is the anchor tenant in the small shopping center. Their own expert presented evidence that there's a three-mile radius concept. He actually said five-mile, but his documentation showed it was a three-mile radius concept around supermarkets. So you want to basically protect yourself the best you can within that three-mile radius. And yes, the first thing that happened was they asked for a super Walmart to come in, and they specifically asked Rentners' permission for that, and Rentners turned them down. But doesn't your position have some real problems with it, too? Because you want to... In the view of the district court, at least, violated the restrictive covenant, but you want to interpret the restrictive covenant in such a broad way that it practically turns out all these little small businesses that have been leasing there and doing business there, and you want to just kick them out and put them out on the street. And I don't understand how the Byler's Baked Goods stores is within the scope of the restrictive covenant, and I don't understand how the barbecue place is necessarily made into a butcher shop. And my point is you want to just... You want to get everybody that sells any little bit of food out of that shopping center, and that's going to just take a lot of these small business owners and throw them out. They weren't parties to the lease or whatever, and you just... You take that covenant, and you want it to read anybody that sells food anywhere in this shopping center is going to have to close down their shop. And that is not what the restrictive covenant said. It only limits certain kinds of food stores, and I don't understand how the Baked Goods store and the barbecue shop fall within it. Why aren't those factual findings on the part of the district court to the nature of those businesses, what they sold and all the rest? Why aren't they factual findings subject to a clearly erroneous standard? Well, Your Honor, it's because the interpretation that was made will go into those specific arguments, and they're the arguments that are on our side of the case. The sales area, as the court just defined it, they defined the sales area only to be the actual service cases. So if you had a service area behind it or in front of it, none of that counted towards the 25%. You are allowed to sell foods there. The concept is the store, like a Rite Aid or some type of drugstore that has a slight area, less than 25% generally, as the least goes, that would have milk in it or bread in it or something that you're not really competing with a supermarket. But what they did here and what the court did was they took the sales area and only concluded the actual glass containers, not the area in front of it, not the area behind it. So you took the 25% rule. How that area is constructed, whether you take an island and include it or don't include it, wouldn't that be factual in nature? Well, with respect to how you interpret the leash, Your Honor, the leash specifically interprets it as being a percentage of an area that's excluded from another area. So if you're taking 25%, they're basically saying you could stack up a supermarket. And as long as you had open space and you had all the stuff in the middle and you had a big area, 50,000 square feet of just open space, well, now the floor space isn't counted against it. So you're only within 25%. You don't count the aisles, according to the court. You don't count the service areas behind where they're taking your money or where they're putting the sliced meat into. With respect to the barbecue shop, Your Honor, the reason for our argument with respect to that is they are selling, they are cutting and selling raw chicken. And that portion of their shop should have been shut down. If they want to sell barbecued prepared chicken, we understand that falls into the restaurant exception. But raw chicken being cut and sold by the piece or that circumstance, that's the butcher. That's another butcher. And that should have been excluded under the first provision of the... But this was a battle of expert witnesses between Curry and McGowan and the district court credited Curry's testimony as being more persuasive as to the use that was made of the island display. I mean, you had a conflict in the testimony, didn't you? As to what use was being made of the island display and didn't the district court credit... Didn't the district court credit Mr. Curry on that point? It was with respect to whether or not the area... The display was clearly belonged to the bake shop. The bake shop would have been otherwise excluded if you applied the 25% rule. However, what the court did was the court did not include any of the area, any of the open space area. So the idea was you just count that square, you just count the actual displays. You don't count any space behind the display. You don't count any of the space in front of it where the customers would actually be. All you do is count the display and then you take that and divide it by the other open space. Why isn't that heavily factual? Because it goes to the specific interpretation of the lease as to what the 25% was applying to. The 25, as I said, you take those exceptions and you make them into something that doesn't make any sense because they're... We're going to turn this little store that was never a part of the lease, we're going to shut down that fellow's business and put him on the street. Put him three miles away, Your Honor. I mean, that's actually what would happen. I mean, they could move their business to any other... It doesn't seem like a big difference to you, but it might be to somebody that put his business career on the line in a particular location. He didn't do anything wrong. Well, with respect to the... He didn't violate it. He wasn't partied to the lease. He didn't violate anybody's rights at any time. We're going to just say pull up your roof, pull up your business, go three miles off. With respect... It's a big deal for a small businessman. I agree, Your Honor. With respect to the JTF, who has the flea market, they were fully aware of the Redner's lease. In fact, they got indemnification specifically from Joppatown. They probably thought they were compliant. They required their lawyers to prepare a detailed document that got indemnification and got Joppatown not only to agree to indemnify them, but defend them and pursue any litigation that Redner's brought, which, of course, Redner's brought us. We don't have any district court findings to the fact that they did wrong in any way. Not that they did wrong, Your Honor, but that they were fully aware of the lease and that at the time they were referring to the... Except for the fact that the district court found them in compliance. Well, they found the individual sites in compliance as it pertains to how they interpreted the 25% rule, Your Honor. Correct. But they didn't find that the flea market didn't do this and didn't do this whole process along with Joppatown to try to escape... You want to avoid any competition at all. I mean, Joppatown wants to flood you with competition in violation of the lease. You don't want any competition at all. We just want compliance with the actual restrictive covenant, Your Honor. That's at a high level of generality. I understand, Your Honor. With respect to the last issue on the defense side with the reparable harm argument, again, it wasn't covered by opposing counsel, but clearly that is not a federal question issue. They ask you to follow the eBay cases after the Supreme Court said that you need to have a reparable harm on a permanent injunction. Every single case that's cited by Joppatown is a federal... It's either a copyright case, a trademark case, or a patent case. And if you actually look at the decision, the district court decision in the case of DuPont, that case lays out the fact that you look at state law. Clearly, state law here in Maryland says you don't need to show reparable harm when the parties have specifically contractually agreed to a restrictive covenant. Otherwise, you would be putting an additional burden after you've just said you would agree to these terms. I think they're all the defenses that were raised by Joppatown. The other issues raised by the plaintiff, with respect to lost profits, Redner's put on testimony from one of their employees who specifically looked at what sales had taken place at the site of the two units that the court did find to be in violation. He compared those sales to the sales, the type of sales that Redner's had. He testified specifically to that. Maryland's law says you can't accept lay testimony with respect to that issue. He then showed a trend, actually showed a loss of sales over the time period from the period of time that those two sites, those two units, opened to the point that the court ordered them closed and showed that there was a loss. Then he also testified to what the profit margin was that Redner's had. The court said that that evidence was too speculative because in the court's opinion it was Redner's burden to specifically come up with... The court was aware of the standard for lost profits, which is they have to be shown with reasonable certainty. But not mathematical precision. Well, that is true, but this was a district court call, wasn't it, as to whether an element of lost profits was shown with reasonable certainty? I think with respect to the way they applied... If you look at the national MECA graphics case, on page 39 of our brief, that's a Court of Appeals case, 1983. Specifically in that case the court said when you've been able to isolate the fact that there's been unfair competition and there's been competition in that territory, you don't need to exclude other ways. If you can show there was lost sales, you don't need to show that those lost sales could have been caused by something else. The terminology the court uses is that effectively the defendant is a stop. Well, I thought that... I couldn't see where they were wrong. I thought the overall impression that the district courts had was that you just didn't prove your lost profit damages in any non-speculative way. And it is kind of an iffy thing to say, well, this particular seafood store, this particular butcher store which is located in the shopping center caused this amount of lost profit to Redner's. I mean, that's... It's a bit of a difficult thing to pin down. But you got your equitable remedy, didn't you? Correct, Your Honor. I mean, those two outfits are going to be forced to leave the shopping center. Well, one's come back. That's another appeal. I don't know if that was a mandatory injunction that they leave. There was, Your Honor. Okay, so you got your equitable relief which was probably the best judgment for the district court to make. And then it took the more speculative form of relief and said I'm not going to give you that on top of it because the lost profits from these other stores are just too fuzzy because you can't tell if somebody buys some fresh seafood from what is... What's the name of it? All Fresh Seafood. And they had decided not to buy the seafood from All Fresh Seafood. You don't know that they would have gone to your shop. You don't know that they would have gone to Redner's. They might not. They might not like your seafood. They might think it isn't fresh enough. They may prefer to buy the seafood from a specialty store rather than from a general market. And so the district court was right in saying, you know, this is too fuzzy. Your Honor, that National Metrographics case is the exact same facts. There they said they were unable to isolate the fact whether they could have been sales that would have went elsewhere and the court said... Did you all even offer the same things? I mean, let's say All Fresh Seafood offers crab. Did Redner's offer crab? I don't know that you even offered the same seafood product. Your Honor, there was testimony to that effect by Mr. O'Brien. There was specific testimony where he actually... Well, were the prices the same? Because maybe the shoppers were price shopping. He did a chart and the chart showed the pricing comparisons as well, Your Honor. So that evidence was put in the record but the court said that it was Redner's burden under Maryland law to isolate where those sales were going to go. And that Metrographics case says otherwise, Your Honor. These district courts sort of split the baby, didn't they? We think a little bit on their side, Your Honor, but yes, Your Honor. You got your injunction. Yes, Your Honor. Well, that's what you were primarily after to begin with, wasn't it? Yes, Your Honor. That's right. So why do you say it's a little bit on their side? I mean, they're saying it's a little bit on your side. Maybe both of you should have been satisfied before going to the appeal. You all went through a whole bunch of judges up there. We had two judges, Your Honor. You had two, but you went once and went back to a magistrate court and somebody objected and said he didn't have any jurisdiction or something. Correct. And he lost it. So actually three, wasn't it? We almost had three. We had a settlement judge as well. You went to the magistrate there. One time the judge played and then you got Judge Bennett into it. It did a lot of work. All of you did a lot of work. I mean, what, you had a seven-day trial or something? It was over a period of time. I believe it was eight, Your Honor. Eight-day trial. And you put a lot of legal work into this thing. And you got primarily what you wanted, which was the injunction. I understand, Your Honor. As I think about it, it was two settlement judges, magistrate judge, and two trial judges. All right. So you did move around the district a little bit. You're not going to have a bad Halloween. You got a good bit of what you wanted. Mr. Kerr got a good bit of what he wanted. Nobody got all of what they wanted. We had some good judges down there, though. Anyway, you've got some further time. And Mr. Kerr has some further time. Thank you, Your Honor. The injunction issue has come up. And to me, that is an important issue before this court. In Ebay and in the Christopher Phelps case, language is clear. Basically, the standard for considerations for a permanent final injunction, both by this court and the Supreme Court, are supposed to be the same. And the number one element on that is the showing of irreparable harm. The argument is made that somehow the statement that was made in the cases that in any type of case really meant any type of case that's subject to federal jurisdiction, not the diversity jurisdiction. There's nothing I see in either one of those opinions to say that. But why was it an abuse of discretion for the district court to conclude this is a clear violation of the restrictive covenant and there will be ongoing harm if these two vendors remain? And we review this under an abuse of discretion standard. And how did the district court abuse its discretion? Who are the district judges? Judge Legg. Judge Legg and Judge Bennett. Yes, sir. How did they abuse their discretion in saying, I think this is a blatant violation of the restrictive covenant and if the violation is an ongoing one and I just let it continue, then there's going to be continuing harm. I mean, why is that an abuse of discretion on the part of a trial judge? The trial judge that actually made that decision, Judge Bennett, came to the conclusion irreparable harm was not an element he had to consider at all. And he did that because he said that Maryland law... He said Maryland law doesn't require irreparable harm. Does not require it. He says, Maryland law doesn't require irreparable harm for injunctive relief. That, well, for certain types of injunctive... But, yes, that's exactly what he said. And the position here is that I submit to the court is wrong, given what the Supreme Court said in Ebay and what this court said in Christopher Fell. But he said Maryland law applies. But you're saying Maryland law doesn't apply. That's correct. You don't argue with... You don't argue with the proposition that that's the Maryland law. No, I do. You're saying Maryland law doesn't apply here, that there's a federal law and it overrides it, and you're entitled to it. Like any trial lawyer, we walk on several fronts. Assuming that that was the law, it would be wrong because federal law, not state law, applies. But that's not state law. State law, again... Well, you say it isn't proper state law. It is not. He missed it on the state law. He did. Did you in any way look at it? Well, I thought you were going to give him... No, he missed it on the outland case. He missed it because of the Chesnut case. But the land-led case, talked about two months later, says that in restrictive covenant cases, you have to show irreparable harm. The problem you've got in that area. Frankly, the same kind of problem that was in the capital tool case that Judge Butzner had to deal with many, many years ago when he was trying to wrestle with, is there a difference on a final injunction between state law and federal law? And in a diversity case, do we follow state law or federal law? I respectfully submit that Judge Klepsner did not decide that case on the issue that was before it. He was dealing with a preliminary injunction. Why wouldn't it be irreparable harm? Why would it not be? Why does it make a difference? Because irreparable harm is an extraordinary remedy. You've got to have something very unusual to make it worth having the court come in and intervene in this fashion and throw somebody out of the flea market. So what do you think should be the remedy for your violation of the restrictive covenant? Let's assume that there's a violation of the restrictive covenant. The traditional remedy at law, damages. And that is what they should have gotten. And when they went to prove it, they proved no damages. This is a case, Your Honor, that has $2 awarded to the other parties. So you're saying they were entitled to damages, but not to an injunction. Correct. And they failed to prove their damage. Correct. And that is what normally happens in Maryland. That's with the Yaffe case. Another case, trying to enforce specific performance. Basically, you've got the right to prove what you've got to prove. They couldn't prove damages. They lose. They don't get the chance to throw the guy out of his apartment at that point. So you're saying the guy gets to stay there. He gets to stay there. That's right. Well, like a right of adverse possession or something? No. I mean, they can still sell the seafood down there notwithstanding the provisions of the government that it's illegal. Unless and until they can show damage in this context, there is no equitable remedy available to them. That's the point, I think. So what good is the contract? What good is the lease agreement? You could presumably on that,        and they're not going to be able to pay the rent. Well, that's not going to work. That's not going to work. That's not going to work.  the rules are too speculative and then the contract means nothing. No, I think it does mean something. I think what it means is there's got to be a sufficient height of arm to warrant the court's intervention. The court has to wrestle with that angle. The court has to decide this is a sufficient let me give you another example. In the restrictive covenant cases that are easiest to follow, you get a guy who is putting a small hut on his back lot and that violates the general plan, no huts in the back. That is a form of irreparable harm because what the people bargained for was uniformity, not the price of putting a hut in or out. That's the kind of thing that would justify an injunction. All right, let's hear it from the other side, okay? Your Honor, real quickly on this issue. The only reason why irreparable harm is before the court is because Speak up. I'm sorry. The only reason why irreparable harm is before the court is because the court in applying Maryland law said it's not required. But the court just focused in on the issue. If this is a case where it's virtually impossible to prove actual damages because otherwise you would have to stop every person who left the all fresh seafood or the all fresh meat shop and asked them would they otherwise have purchased it at Redner's, you can't do that. You can never do that. So you bargain specifically for a clause that said the other side wouldn't do it. This is not an unusual case. The court pointed out right at the beginning how unusual it is. They opened the two shops, the gentleman Did you bargain for specific performance or what? No, we bargained that they would not do this and when they did it they should be enjoined from doing it any further. But he says you got to prove irreparable harm. But he's defining irreparable harm as what? Money damages. He's not as money damages. But you're saying you don't have to show irreparable harm. I'm saying under Maryland law under the Chestnut case it specifically says that irreparable harm once you've contractually agreed to the restriction that's the Hutt case he's referring to. Once you've contractually agreed to that restriction you're barred from doing it and permanent injunction can be issued. You have to get   to agree to comply with their contractual bargaining. Correct. And that is actually what the Chestnut case says under Maryland law. So you can't bargain for specific performance under Maryland law. There's other cases that hold the same situation. The employee cases it happens all the time. You can't necessarily show where the employees are soliciting. They're not disclosing that to you. So the courts have routinely said in Maryland or otherwise that the employee is restricted from contacting these customers is restricted from doing sales with certain people is restricted from a particular area of work. Courts have enforced those all the time and found that it would be irreparable harm. The case that cited the DuPont case that the lower court cited here is a case where it was Virginia law. Which judge dealt with this? This was Judge Bennett, wasn't it? This was Judge Legge. Judge Legge? This was Judge Legge and Judge Legge relied on the Chestnut case and also relied on the case out of the Eastern District of Virginia. The Cohen case which I guess has been litigated up to this court three or four times or two or three times at least. But on that issue on that specific issue it said you first look at state law and you look to see what state law requires. You don't look at the federal component and eBay. Why look at state law? Because it's because the contract, the lease and the restrictive covenant under that lease is interpreted under state law. No one's raised we're not here on diversity. We're not here on the federal question. Every single case Joppatown cites is a federal question case where it talks about requiring irreparable harm. But the point is that there's essentially absolutely there's no remedy at all. Correct. And it was how Your Honor started this argument which was the fact that you basically say I'll agree to all these things. They talk about how heavily it was negotiated to by two before sophisticated counsel and then they open two shops that are named after the restriction. I mean it really does seem to be right in the face of Redners refusing to allow the What we would be saying to landlords across the state of Maryland is you can get these restrictive covenants you can lure an anchor shop and then you can proceed to violate the restrictive covenant and nothing can be done because lost profits are always going to be too speculative and an injunction is going to be  And so you sort of blueprint the path for an employer I mean not an employer for a landlord to undertake a contractual obligation which the courts wink and nod at and says perfectly fine for you to violate it I agree with you your honor Any other questions? Thank you Alright we will adjourn court and come down and re-counsel This honorable court stands adjourned until tomorrow morning at 9.30 God save the United States and this honorable court
judges: J. Harvie Wilkinson III, Robert B. King, Clyde H. Hamilton